IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JORAI MASSA ABAD,

      Plaintiff,

v.                            **CASE NO. 2:11-cv-00629**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## MEMORANDUM OPINION

This is an action seeking review of the final decision of the Commissioner of Social Security denying Claimant's application for child's Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Jorai Massa Abad (hereinafter referred to as "Claimant"), also known as Chico Abad, filed an application for child's SSI on July 16, 2009, alleging disability as of January 1, 2001 (when he was age 13) due to Attention Deficit Disorder [ADD], Attention Deficit Hyperactivity Disorder [ADHD], dyslexia, and depression.  (Tr. at 16, 177-83, 209-16, 247-52, 264-69.)  Claimant also protectively filed an application for SSI on July 16, 2009 (when he was age 21), alleging disability due to headaches, knee pain, ADHD and depression.  (Tr. at 16, 19, 167-69.)  Claimant filed a subsequent application for child's SSI based on disability on August 20, 2009 (when he was age 21).[1]  (Tr. at 16, 170-76.)  The

---

[1]    Claimant filed for SSI as well as filing two child's disability insurance benefit claims, one under his mother's social security number and one under his father's social security number. (Tr. at 167-69, 170-71,  177-78.)

claims were denied initially and upon reconsideration.  (Tr. at 16, 65-69, 70-74, 76-78, 79-81, 82-84.)  On October 28, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 85.)  A video hearing was held on February 17, 2011 before the Honorable William R. Paxton, at which Claimant, Joyann Rulli, Claimant's aunt and guardian, and Patricia B. Posey, an impartial vocational expert, testified.  (Tr. at 30-57, 95, 102, 125, 132, 158, 160.)  By decision dated March 28, 2011, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 16-29.)  The ALJ's decision became the final decision of the Commissioner on September 7, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On September 16, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Child Disability Benefits

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  Under the regulations in force during all times relevant to Claimant's claim, the ALJ must determine whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(b) (2010).  If the child is, he or she is found not disabled.  Id. § 416.924(a).  If the child is not, the second inquiry is whether the child has a severe impairment.  Id. § 416.924(c).  An impairment is not severe if it constitutes a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."  Id.  If a severe impairment is present, the third and final inquiry

2

is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 416.924(d).  If the claimant's impairment meets or functionally equals the requirements of Appendix 1, the claimant is found disabled and is awarded benefits.  Id. § 416.924(d)(1).  If it does not, the claimant is found not disabled.  Id. § 416.924(d)(2).  Other applicable rules are found at §§ 416.924a, 416.924b, and 416.929.

Adult Disability Benefits

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2010).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance

of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2010).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

ALJ Findings on Child Benefits

In this particular case, the ALJ determined that the Claimant had not attained age 22 as of January 1, 2001, the alleged onset date, or as of August 20, 2009.  (Tr. at 18.)  The ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  Id.  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of attention deficit hyperactivity disorder (ADHD) not other specified (NOS) and dysthymic disorder.  (Tr. at 18-19.)  At the third and final inquiry for child SSI benefits, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 19.)  On this basis, child SSI  benefits were denied.  (Tr. at 29.)

ALJ Findings on Adult Benefits

The ALJ found that Claimant was 18-49, a younger individual, on the alleged disability onset date.  (Tr. at 28.)  He found Claimant had at least a high school education

4

and is able to communicate in English.  Id.  He concluded that transferability of job skills was not an issue because Claimant does not have past relevant work.  Id.  The ALJ then went on to the fourth inquiry and found that Claimant has a residual functional capacity for a full range of work at all exertional levels, reduced by nonexertional limitations. (Tr. at 20-28.)  The ALJ concluded that Claimant could perform jobs such as vehicle washer, hand packer, and produce weigher which exist in significant numbers in the national economy. (Tr. at 29.)  On this basis, benefits were denied.  Id.

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claims is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v.Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on October 10, 1987; thus he was 13 years old on the onset date of January 1, 2001, and 23 at the time of the administrative hearing.[2]  (Tr. at 28, 36.) Claimant went to the 11th grade in high school "in regular education classes with reteaching in resource setting" (79% regular education environment, 21% special education environment) and obtained a General Equivalency Diploma [GED] in 2006.[3]  (Tr. at 36-37,

---

[2]    Records indicate Claimant's natural parents' deaths occurred following an RV accident wherein "not realizing the extent of the damage to the RV, going to sleep and dying of carbon monoxide poisoning."  (Tr. at 387.)  Claimant was raised by an aunt, "Aunt Bagyi", from the age of eighteen months until his adulthood.  (Tr. at 445.)  In late 2003, when Claimant was 22 years old, "Aunt Bagyi" died due to cancer and another aunt, Joy Rulli, began "helping to take care of him."  (Tr. at 435.)  In September 2010, Claimant's Aunt Joy Rulli petitioned for guardianship/conservatorship of Claimant and on March 8, 2011, she was named the guardian/conservator of Claimant by the Nicholas County Circuit Court.  (Tr. at 462.)

[3]  The records from Nicholas County Public Schools are mostly handwritten and poorly organized.  (Tr. at 284-313.)  The records show Claimant primarily received a mixture of A's, B's and C's in grades 1-6 with the 4th grade repeated due to all C's and D's being recorded.  The repeated grade shows his grades improved to all A's and B's.  (Tr. at 284.)
      Records from Nicholas County Public Schools dated May 12, 2004 describe Claimant's educational performance: "Chico is a 9th grade student currently enrolled in his 3rd 9-weeks at SJHS.  According to his most recent psychoeducational report (1/7/98) he has average ability.  He has demonstrated poor academic performance this year.  His teachers report that he frequently does not complete his assignments.  He works very slowly.  Work sent home to be finished usually is not brought back.  His IS and Resource classes were used this year to try to keep him organized and to finish any work he needed to.  He was very inconsistent in filling out his assignment book.  He seldom brought work to IS on his own.  Also, Chico frequently was tardy for his classes.  Most of the assignments he worked on in IS were sent by his teachers directly to the IS teacher.  In the first semester, Chico received failing grades in science, English, and American History.  He received passing grades in Resource, P/E, Math, and Computer Tech. (Tr. at 306.)
      Records dated November 19, 2004 state: "Mrs. Bagyi requested in writing...for review of IEP.  At meeting, she requested psychological evaluation.  Jorai was having an attendance problem and was failing all academic classes at mid-term.  According to his teachers, Jorai shows no effort, is irresponsible in doing assignments and turning them in for grading.  He is generally well behaved." Id.
      Records dated May 18, 2005 state: "Jorai has average intelligence.  He has good social skills, expressive language skills, no difficulty reading words.  Has difficulty with memory causing problems with all his academics.  Will receive academic instructions in regular education classes with reteaching in resource setting.  Jorai will receive reteaching and reviewing strategies in tutorial resource to improve his time-on-task and task completion." (Tr. at 293.)

6

40, 312, 388, 393.)   In the past, he worked for four months full-time at a fast food restaurant, and for 14 months part-time at a fast food restaurant.  (Tr. at 49-50, 211, 222, 244.)

<u>The Medical Record</u>

The court has reviewed all evidence of record.  Claimant challenges only the ALJ's assessment of his mental impairments; thus the court will summarize only the mental health evidence.

Records indicate Claimant was treated at Summersville Pediatrics from July 13, 1993 to January 15, 2007.  (Tr. at 322-65.)  Although the vast majority of these handwritten records deal with common childhood illnesses and routine childhood examinations,  some of the notes deal with mental health issues, which will be discussed below in chronological order.

Records indicate Claimant was treated at Seneca Health Services, Inc. [Seneca] from September 28, 2004 to July 13, 2010, for psychological concerns.  (Tr. at 366-93, 459-61.)  At the initial psychiatric examination dated September 28, 2004, Lois A. Urick, M.D., Staff Psychiatrist, stated:

> Jorai, who also goes by "Chico," is a 16-year-old male student who is a voluntary patient at Seneca Health Services, Inc.  He is referred by his aunt for this first admission to Seneca.  He is referred by his case manager for initial psychiatric evaluation to render diagnosis and recommendations...
>
> **HPI** [History of Present Illness]:
> Jorai reports today that he has some problems "keeping my cool," noting that when he gets upset he gets angry and will yell at people.  He denies any other particular problems, and in fact doesn't report that the problem with anger is very significant.  It is clear, however, that he isn't going to give much detail in front of his aunt; the nonverbal language reveals some resentment and anger towards her, and he appears unwilling to talk much about himself today.  Aunt reports that she is worried about him because he listens to music

she does not approve of, she doesn't like the way he dresses or the people he hangs out with, and she feels he is disrespectful at times. He denies any problems with depression (but he does report he has been depressed in the past), although he has reported to his therapist, with whom he has a good rapport, that he has been experiencing depression and has even spoken of passive suicidal ideation recently. He states that he doesn't like days with bad weather because they make him "kind of shut down" until the weather improves. The patient does today report that he doesn't have much energy and sometimes doesn't feel like doing things, and he would like for this to improve. He denies history of hallucinations, paranoia, mania, OCD [obsessive compulsive disorder], eating disorder, self-mutilation, suicide attempt.

**PAST PSYCHIATRIC HISTORY**:
The patient states that he has not previously been in therapy, has never used psychotropic medications and has never been psychiatrically hospitalized (accordingly, there are no old records available).

**SUBSTANCE USE HISTORY**:
There is no report of abuse of substances.

*   *   *

**SOCIAL HISTORY**:
The patient is the younger of two boys who were raised by their biological parents until they died when he was 18 months old. Since then, they have lived with their aunt. He reports an "okay" childhood with no history of abuse. He is in 9th grade and is in special education classes due to some sort of learning disability. He denies any behavior problems at school. He doesn't particularly enjoy school and grades are only fair. He enjoys riding a bike, skateboarding and video games. He has several friends and reports stable friendships. He is covered by Medicaid.

**MSE** [Mental Status Evaluation]:

The patient is AOX4 [alert and oriented times four (person, place, time, situation)], exhibits good dress/grooming/ hygiene, has good eye contact and no psychomotor abnormality. Manner is age-appropriate; he is somewhat withdrawn and sullen but it appears that this is due to his feelings toward his aunt. Affect blunted, mood "fine." Speech is WNL [within normal limits] in rate, tone and content. Thoughts are goal-directed, and there is no evidence of delusional content. Attention, concentration and impulse control are intact, and sensorium is clear. Cognition appears intact and intelligence is estimated as average. Recent and remote memory appear grossly intact. The patient denies auditory and visual hallucinations, paranoia and lethal ideation. Insight is partial, judgment is good.

8

**DIAGNOSIS**:

| | | |
|---|---|---|
| Axis I: | 311 | Depressive Disorder NOS |
| | V61.20 | Parent-Child Relational Problem |
| Axis II: | V71.09 | No diagnosis |
| Axis III: | | Seasonal allergies; history of migraine headache |
| Axis IV: | | Mild psychosocial stressors |
| Axis V: | | 55 |

**PROGNOSIS**:     Fair.

**RECOMMENDATIONS**:
1.    In order to address depression, we will try Prozac 20 mg qd (chosen in part because his brother has had a robust response to this medication). We discussed the recent media reports of suicidal behaviors in adolescents; both patient and his aunt are aware and are comfortable with the use of this medication.
2.    The patient is strongly encouraged to continue therapy with Janie Cole.
3.    Crisis intervention and TCM [Targeted Case Management] as appropriate.
4.    RTC [return to clinic] 1 month.

(Tr. at 369-70.)

On January 11, 2005, Dr. Urick, Seneca Health Services, stated in treatment notes: "The patient states that he is "fine." He states that the Prozac is well-tolerated and "makes me feel happy." He denies any problems with depression and anxiety. He states that he and his aunt are getting along reasonably well although they argue at times...ASSESSMENT: Depressive Disorder NOS, apparently asymptomatic at this time." (Tr. at 380.)

On February 2, 2005, Annette Zavareer, Ed.D., stated in a student records (Claimant was 17 years old and in the tenth grade) psychological report:

BEHAVIORAL OBSERVATIONS AND INTERVIEW:
Jorai is a nice looking young man who was neatly groomed at the time of evaluation. I found him to be very pleasant and responsive. He displayed good manners. His THREE WISHES: "To get a good job. To try to help out

my Mom.  Have a good life after graduation."  These wishes indicate sensitivity and good values.  He hopes to either become a Welder or work on Computers.  He really likes the Vocational School.  He stated that the problem that bothers him most involves memory.  "I can read and not remember what I read."...

EVALUATION RESULTS AND ANALYSIS:
Generally, the results of all tests administered concur.

STRENGTHS: He is a person of Average Intelligence.  He has good social skills and appears motivated.  His Expressive Language skills are very good.  He seemed to have no difficulty Reading Words.

WEAKNESS: He seems to have difficulty with memory.  As a result his math skills and reading skills have suffered.

WAIS-III SCORES...
VERBAL SCORE:                    107
PERFORMANCE SCORE:           94
FULL SCALE IQ SCORE:   102...

RECOMMENDATIONS AND SUMMARY:
The current state standards of West Virginia require a statistically significant discrepancy between academic performance and ability for placement in SLD [Specific Learning Disabilities] programming.  According to the results of this evaluation, Jorai's scores meet those requirements for placement.  Any placement must take into account the social and emotional well being of the student as well as academic performance.  If Jorai has any chance of achieving a productive life it will come from a Vocational Education.  He is already in the Middle of 10th grade and continues to have significant problems with all his academics.  Since his interests seem to be in Welding and Computers that would be the way I would direct him.  He also expressed some interest in the Military and that too could be a career option.

(Tr. at 445-47.)

On May 12, 2005, William Hagerty, M.A., Licensed Psychologist, and Tammy Ray,

M.A., L.S.W., Supervised Psychologist, Seneca Health Services, Inc., provided a

Psychological Evaluation of Claimant:

**Reason for Referral**: Jorai was referred for a psychological evaluation by Janie Cole, Child and Family Therapist, in order to assess for any personality disorders as well as determine IQ.

10

**Relevant History**: Jorai is a 17 year old male student.  He is currently in the 10th grade at Nicholas County High School.  He resides with his aunt (whom he calls "mom").  His biological parents were killed in a car accident when he was 18 months old.  He reports knowing very little about his parents.  He and his aunt have a very poor relationship according to Jorai.  He stated "as soon as I turn 18 I'm leaving".  He is unsure of what he wants to do when he gets out of high school.  He is currently being seen by our staff psychiatrist and is prescribed Prozac 20 mg qd.

**Minnesota Multiphasic Personality Inventory-A (MMPI-A)**
Jorai's MMPI-A appeared to be valid.  All of the validity scores were within the normal range as were the basic profile scores.

**Kaufman Brief Intelligence Test 2 (KBIT2)**
Jorai's results on the K-BIT2 are presented below.  Overall, his performance places him within the average range of intellectual ability...

**Vocabulary**: Jorai's Vocabulary standard score of 98 was better than the scores of 45 percent of the people in the national norm group...

**Matrices**: Jorai's Matrices standard score of 85 was better than the scores of 16 percent of the people in the national norm group...

**K-BIT2**: Jorai's standard score of 90 on the K-BIT2 IQ Composite was better than the scores of 25% of the national norm group...The 13 point difference between the vocabulary standard score and the matrices standard score is not statistically significant at the .05 level of confidence.

**Diagnostic Impression**
| Axis I: | V61.20 | Parent-Child Relational Problem |
| | 311 | Depressive Disorder NOS |
| Axis II: | V71.09 | No Diagnosis |
| Axis III: | V71.09 | No Diagnosis |
| Axis IV: | | Discord with guardian |
| Axis V: | | GAF 55 |

**Recommendations**
1.    Continue medications as prescribed by the psychiatrist.
2.    Continue individual therapy in order to improve coping skills related to the relationship problems with his aunt.
3.    Crisis Intervention and TCM as appropriate.

(Tr. at 367-68.)

On July 18, 2005, Dr. Urick stated in treatment notes: "The patient presents to the

office today for a medication check.  He reports that he is doing well and denies any problems with depression and anxiety.  He feels Prozac continues to control symptoms with no side effects reported...ASSESSMENT: Depressive Disorder NOS - asymptomatic at this time."  (Tr. at 379.)

On October 11, 2005, Dr. Urick stated in treatment notes: "The patient presents to the office today for medication management.  He reports that he is doing well and denies problems with depression or anxiety.  He feels the Prozac continues to control symptoms with no side effects reported...ASSESSMENT: Depressive Disorder NOS - asymptomatic at this time."  (Tr. at 378.)

On November 5, 2005, treatment notes from Summersville Pediatrics state that Claimant is

> [h]aving trouble at school.  Failing classes.  Not bringing homework home.  Not completing work. Mind wandering.  At home Mom has trouble with him finishing things.  Mom says at night he enjoys TV, watching movies, playing with (illegible).  Pt [patient] says he can get his homework done at school so he doesn't have to bring it home.  Work is incomplete.  Very vague responses given as to discipline but Mom says he will disobey her and if she tries to take away privileges he takes them back.  Mom thinks he is "forgetting" or ignoring her.  Says it has been going on for years...Refer to Dr. Khalid Hasan - Beckley per mom's request.

(Tr. at 352-53.)

On November 23, 2005, Dr. Urick, Seneca Health Services, stated:

> The patient reports that he is doing "pretty good."  He feels that the Prozac is helpful, and states that he isn't really experiencing depression any more.  He says that he never did think about suicide and isn't sure how that got into the chart.  He also feels that anger control is improved, although he does continue to have annoyance with his aunt over what seem to be fairly normal parent-teenage issues.
>
> **ASSESSMENT**: Depressive Disorder, NOS, apparently with good initial response to medication and therapy.

(Tr. at 381.)

On January 10, 2006, Dr. Urick stated in treatment notes: "The patient presents today for medication management.  He reports that overall he is doing well and feels the Prozac continues to stabilize his symptoms.   ASSESSMENT: Depressive Disorder NOS, stable at this time."  (Tr. at 376.)

On February 16, 2006, Dr. Urick provided a Psychiatric Evaluation Update of Claimant:

> **HPI**: Jorai presents to the office today with his mother.  His mother reports that Jorai has not been taking his medication regularly and is experiencing symptoms of depression.  Jorai agrees that he is not doing well and is currently experiencing symptoms of depression to include feelings of sadness, hopelessness and lack of motivation...
>
> **MSE**: The patient is AOX4, exhibits good dress/grooming/hygiene, has good eye contact and no psychomotor abnormality.  Manner is appropriate.  Affect broad, mood euthymic.  Speech is WNL in rate, tone and content.  Thoughts are goal-directed, and there is not evidence of delusional content.  Attention, concentration and impulse control are intact, and sensorium is clear.  Cognition appears intact.  Recent and remote memory appear grossly intact.  The patient denies auditory and visual hallucinations, paranoia and lethal ideation.  Insight is fair, judgment is good.
>
> **DIAGNOSIS**:
>
> | | | |
> |---|---|---|
> | Axis I  311 | | Depressive Disorder NOS |
> | | V61.20 | Parent/Child Relational Problem |
> | Axis II | V71.09 | No Diagnosis |
> | Axis III | | Diagnosis deferred |
> | Axis IV | | Mild psychological stressors |
> | Axis V | | 60 |
>
> **RECOMMENDATIONS**:
> To address depression I will begin Zoloft 25 mg daily for one week and then increase to 50 mg daily.  Prescription given for two months.  RTC 1 month for follow up visit.

(Tr. at 371-72.)

On April 3, 2006, Dr. Urick stated in treatment notes: "The patient presents today

13

for medication management.  The patient reports that the Zoloft has been well tolerated and he feels it has been quite helpful.  He states that it helps keep his mood level and he feels quite good most of the time."  (Tr. at 374.)

Notes from Summersville Pediatrics dated April 7, 2006 state:  "Pt here c/o [complaints of] memory is going (again blaming car accident).  Grades slipping...Can sleep 16 hrs [hours] or more at times.  Denies (illegible) drugs now or ever.  Taken out of school due to failing grades.  Rare headaches.  Has counselor and has seen Dr. Urick."  (Tr. at 356.) On April 10, 2006, notes indicate that "all labs normal.  Recommend discussing with Dr. Urich [*sic*, Urick] and see if sleep problems are related to the mental health problems."  (Tr. at 357.)

On May 4, 2006, Dr. Urick, Seneca Health Services, stated in treatment notes:

The patient presents today for medication management.  The patient states that the higher dose of Zoloft has been well tolerated and he feels it is doing a better job.  He feels it helps to keep his mood higher and thinks that it keeps his mood level most of the time.  He states he does occasionally get down, usually when something doesn't go right, but doesn't feel that this lasts very long or interferes significantly with functioning.  He states he is getting along pretty well with his mother at this time and would like to continue his current dose of medications for now.

**MSE**: The patient is AOX4, exhibits good dress/grooming/hygiene, has good eye contact and exhibits no psychomotor abnormality.   Manner is appropriate.   Affect just mildly blunted as per his ususal, mood "fine".  Speech is WNL in rate, tone and content.  Thoughts are goal-oriented, and there is no evidence of delusional content.  Attention, concentration and impulse control are intact, and sensorium is clear.  Cognition appears intact.  The patient denies lethal ideation.  Insight is fair, judgment is good.

**ASSESSMENT**: Depressive Disorder NOS, fairly stable at this time.

**PLAN**: Continue Zoloft 50 mg qd.  RTC 2 months.

(Tr. at 373.)

On July 14, 2006, Dr. Urick stated in treatment notes:

The patient reports that he continues to do well with the higher dose of Zoloft and states that it helps him to keep concentrated on his academics and helps him feel mellow and happy.  He states he has occasional times when he feels down, but these are not very often...

ASSESSMENT: Depressive disorder NOS.  Currently stable.

(Tr. at 383.)

On October 5, 2006, Dr. Urick stated in treatment notes:

The patient presents to the office today for medication management.  The patient reports that he continues to do well, is in a good mood, and denies side effects from medications.  He is not working, but he hopes to earn his GED and then get a job.  He reports he gets along well with his mom, and he denies any life problems at this time...

ASSESSMENT: Depressive Disorder, NOS, currently stable.

PLAN: We will continue Zoloft at 100 mg qd.  The patient states that he will lose his medical card at the end of the month because he is turning 19, and we will order him some Zoloft.  RTC three months.

(Tr. at 384.)

On January 16, 2007, Dr. Urick stated in a Psychiatric Evaluation:

Mr. Abad is a 19-year-old single, white, unemployed male with a history of Depressive Disorder NOS, who is a voluntary patient at Seneca Health Services, Inc.  He is referred by his case manager for psychiatric evaluation update to reassess diagnosis and treatment recommendations.  Information is provided by the patient, a good historian, and his chart...
HISTORY:
The patient has been doing well over the past six months or so on Zoloft 100 mg q.d. In 2004 and 2005, he had been taking Prozac 20 mg daily with fairly good response, until apparently he stopped taking it around the beginning of 2006.  He was started on Zoloft at 50 mg q.d. And found it to be helpful, and Zoloft was increased in June of 2006 to 100 mg q.d. Due to some mild depressive symptoms.  Since that time, he states he has not experienced depression, has had no lethal ideation, has not had significant anxiety or insomnia, and feels the medication is doing a very good job.  He states that his mood is stable, and he is in a good mood most of the time.  He lives with his aunt who he refers to as his mother since she has raised him since he was

five years old after his parents died.  He reports a fairly good relationship with her.  He states that he is considering looking for a job.  He has no income and is not covered by medical insurance.

MSE:
The patient is AOX4, exhibits good dress/grooming/hygiene, has good eye contact and no psychomotor abnormality.  Manner is appropriate.  Affect is euthymic.  Mood is described as "okay, I guess."  Speech is WNL in rate, tone and content.  Thoughts are goal-oriented, and there is no evidence of delusional content.  Attention, concentration and impulse control are intact, and sensorium is clear.  Cognition appears intact.  The patient denies lethal ideation.  Insight is partial.  Judgment is good.

DIAGNOSIS:
AXIS I:        311.00        Depressive Disorder, NOS.
AXIS II:       V71.09        No diagnosis.
AXIS III:                    Diagnosis deferred.
AXIS IV:                     Mild psychosocial stressors.
AXIS V:                      65

PROGNOSIS:                   Fairly good.

RECOMMENDATIONS:
1.      In order to maintain stability, we will continue Zoloft 100 mg q.d.
2.      Crisis intervention as appropriate.
3.      RTC three months.

(Tr. at 385-86.)

On August 12, 2009, Cathy Edwards, BA/WMHP, Seneca Health Services, Inc., provided a "Social History" of Claimant per a referral of his representative regarding his application for Social Security benefits.  (Tr. at 387-88.)  Ms. Edwards reported regarding Claimant's "Current Support System: Client tries to deal w/ things on his own.  Yet he reports an aunt is trying to help take care of some things.  He is not a member of anything lately.  He does like to hang out and drive around."  (Tr. at 388.)  Regarding a "Summary of Family & Developmental History" she stated:  "Previous tx [treatment] here in the past for psychiatric eval, meds and therapy.  Thought he reported he was ADD when younger,

he never reported being prescribed medications for it...Additional Information:  Client worked for Dairy Queen briefly, and then also Subway.  He reports he couldn't keep up and was fired."  Id.

On August 14, 2009, Donna Meadows, MSN/PMHNP-BC, Seneca Health Services, Inc.,  provided a "Psychiatric Evaluation" of Claimant per a request from his representative regarding his application for Social Security benefits.  (Tr. at 392-93.)  Ms. Meadows concluded:

> Client is a 21-year-old, single, unemployed, Caucasian male.  Presents voluntarily for the readmission with a chief complaint of:  "My aunt is trying to help me get Social Security, and I have to do all the paperwork.  I need to see if I have ADHD."  No current psychiatric medications.  Was last seen by Dr. Urick on 01/16/07.  Last took Zoloft 100 mg when treated by Dr. Urick. Past psychiatric medications include Prozac with a fair response.
>
> HISTORY OF PRESENT ILLNESS:
> Client notes mild depression since the sixth grade.  Notes difficulty in school due to his depression.  Notes has only been mildly depressed at times for the last couple of years.  Says that he does have some mood swings.  Says that his aunt did some research on his mood swings, and he believes he has some mild mood swings.  Says he is happy sometimes and mildly depressed at other times...Energy level is decent; denies any periods of excessive energy. No anger control issues.  Appetite is good.  No real anxiety or panic attacks. No history of self-injurious behavior.  Denies feeling helpless, hopeless or anhedonic.  Says he tries to maintain a happy attitude.  Denies any A/V [audio/visual] hallucinations or suicidal or homicidal ideations.
>
> PAST PSYCHIATRIC HISTORY:
> Denies any prior psychiatric hospitalizations or suicide attempts.  Past psychiatric medications include Zoloft and Prozac.
>
> PAST MEDICAL HISTORY:
> Unremarkable...
>
> SUBSTANCE ABUSE HISTORY:
> Denies any alcohol or illicit drug use.  Denies any tobacco use.
>                              *        *        *
> MENTAL STATUS EXAM:
> Presents as alert and oriented to all parameters, casually dressed with good

hygiene.  Mood euthymic.  Affect a bit broad.  Speech is clear, logical, linear.
Estimated to be of below-average to average intelligence, given fund of
information and verbal skills.  Thought content does not appear psychotic or
dangerous.   Cognition appears intact.   Immediate, recent and remote
memory appears intact.  Insight fair; judgment good.

ASSESSMENT:
Axis I:        Rule out ADHD.
               Rule out Borderline Intellectual Functioning.
               Rule out Depressive Disorder, NOS.
Axis II:       V71.09.
Axis III:      Deferred.
Axis IV:       Limited support system.
Axis V:        GAF=60.

PLAN:
Client notes that he does not need to be on medication; says that actually he
is doing fairly "decent".  He also advised that he does not need to see a
therapist at this time.  He was scheduled for a psychological evaluation with
Bill Hagerty.  May return for a followup on an as needed basis.  Advised to
use the crisis intervention system as needed.

Id.

On August 21, 2009, William D. Hagerty, M.A., L.P., Seneca Health Services, Inc.,

provided a "Psychological Evaluation" of Claimant per a request from his representative

regarding his application for Social Security benefits.   (Tr. at 390-91.)   Mr. Hagerty

concluded:

This client is a 21-year-old, Caucasian male who was referred for an
evaluation to assist in determining diagnosis, treatment, and whether he is
appropriate for Social Security Disability.  Client reports that he is essentially
trying to figure out his diagnosis...Currently he is taking no medications.

Mental Status and Behavioral Observations:

Client arrived on time for his evaluation and was cooperative throughout the
examination.  His appearance was within normal limits.  He reported that he
has a difficult time concentrating and has a difficult time keeping up with
others in terms of social interaction and/or employment situations.  He went
on to report that he loses things easily, and that he has taken Zoloft and
Prozac in the past.  He denied any thoughts of harming himself and/or

anyone else at the time of the examination. He was oriented to person, place, time and circumstances. He denied any kind of hallucinations, and no psychotic behavior was observed during the examination. His appetite and sleep were reported to be within normal limits.

Testing Results:

MMPI-2: The MMPI-2 results were reported to be valid. It is likely that this individual is presenting himself in an improbably favorable light. A genuine lack of awareness or lack of insight is likely the cause of his naive effort at faking good...

People with this profile usually have problems concentrating and periods of confusion. They may have a formal thought disorder. Look for periods of cognitive dissociation, hallucinations, confused thoughts, retarded stream of thought, forgetfulness, and a stereotypical approach to problem-solving.

Diagnostic Impressions:

Axis I  311       Depressive Disorder, NOS
Axis II            V71.09        No Diagnosis
Axis III           V71.09        No Diagnosis
Axis IV            Moderate: stress associated with having a behavioral disorder
Axis V             GAF: 50

Summary and Recommendations:

This client is looking to make sense of his feelings. He is probably confused and discouraged by his limited ability to fit in with others in the community. I recommend that he receive both individual therapy and psychiatric services.

Id.

On August 31, 2009, a State agency medical source provided a Psychological Consultive Examination report. (Tr. at 394-402.) The examiner, Larry J. Legg, M.A., Licensed Psychologist, made these findings:

PRESENTING SYMPTOMS: Mr. Abad reports today, "My mom figured I had ADD and ADHD since she had it and my brother has it. It's kind of hard to stay focused." He claims he has never been evaluated for either of these allegations. He was never treated for them. He did not display any prominent symptoms of inattention or hyperactivity, or impulsivity this date.

When asked about his allegations of dyslexia, he noted "that makes it hard for me to read, my mind wanders off."  He claims he was never diagnosed with this disorder...

When asked about his allegation of depression, Mr. Abad noted, "When I was in junior high and high school, I ran into a little bit of depression."...He indicates that he would stay at home and sleep instead of going to school. He notes that he began receiving services at the age of 17 or 18 from Seneca Health Services...

*      *      *

INTELLECTUAL ASSESSMENT:
WAIS-III:
IQ SCALE:
Verbal IQ      97...Performance IQ      91...Full Scale IQ      95...
VALIDITY: The above-obtained intelligence scores are considered internally valid as the psychometrician reports that Mr. Abad put forth a diligent effort on the test items.  He did not require any repetition of directions.  He was motivated and cooperative and had a good test-taking attitude...Mr. Abad received a Full Scale IQ of 95.  These results place him in the average range of general intellectual functioning.

WRAT-3:...

| Subject | Standard Score | Grade Score |
| --- | --- | --- |
| Reading | 92 | High School |
| Spelling | 88 | 7 |
| Arithmetic | 87 | 7 |

VALIDITY: Again, the psychometrician reports that Mr. Abad put forth sufficient efforts on the assessments ...Mr. Abad did not have any problems with identifying single words.  He did not transpose any letters in his words. His handwriting was neat and very readable.  There was no delay in his spoken language.  He did not seem confused with directions.  His reading, spelling, and mathematical scores are generally consistent with his ability standard scores found this date.

MENTAL STATUS EXAMINATION: Appearance: Mr. Abad has blue eyes and black hair.  He was appropriately casually dressed and groomed this date. Attitude/Behavior: Motivated, cooperative, and polite. Speech: Normal tone with adequate production, somewhat slow in pace. Orientation: Oriented X4. Mood: Slightly dysphoric. Affect: Flat. Thought Process: Stream of thought was within normal limits.  Thought Content: Normal.  Perceptual: No evidence of hallucinations or illusions. Insight: Fair. Psychomotor Behavior: Normal. Judgment:  Within normal limits, based on his response to the "mail it" question on the WAIS-III Comprehensive subtest.  Suicidal/Homicidal

20

Ideation: None reported this date.  Immediate Memory: Judged to be within normal limits as Mr. Abad could repeat a list of four words given to him back to me immediately.  Recent Memory: Judged to be within normal limits, as Mr. Abad could recall three of four words given to him five minutes prior to this request.  Remote Memory: Judged to be mildly deficient, based on clinical observations of his inability to recall details of his personal history. Concentration: Judged to be within normal limits, based on a WAIS-III Digit Span subtest scaled score of 8.  Persistence: Within normal limits, as demonstrated by clinical observations of his ability to stay on task during today's evaluation.  Pace: Mildly deficient, as observed during today's mental status examination.

SOCIAL FUNCTIONING: During the Evaluation: Mildly deficient, based on clinical observations of his social interactions with me and others during the evaluation.  Mr. Abad displayed very infrequent eye contact.  Self-Reported: Mr. Abad claims to have several friends and family members that he interacts with from time to time.  He leaves home practically everyday to take a walk with his friends.  He does not play any sports.  He is not a member of any club or organized community group.  His most enjoyable activities are taking walks, visiting his friends, and playing his X-box.

DAILY ACTIVITIES: Typical Day: Mr. Abad is generally out of bed between 10 and 11 a.m.  He will brush his teeth, shower, and fix breakfast.  He notes "I hang around the house until I go visit with my friends."  He claims he does not have a car so he walks to complete his errands and visit his friends.  He will come back home in the evenings.  He notes, "I just spend a lot of time hanging out in town."  He is eating three meals a day.  He tries to be in bed by 11 p.m.  Activities List: Mr. Abad indicates most of his day is spent either at home or visiting his friends.

DIAGNOSES:

| | | |
|---|---|---|
| Axis I 314.9 | | ADHD, NOS. |
| | 300.4 | Dysthymic disorder early onset. |
| Axis II | V71.09 | No diagnosis. |
| Axis III | | None reported. |

DIAGNOSTIC RATIONALE: The diagnosis of ADHD, NOS is being made solely on my interview with the claimant today.  Mr. Abad reports a history of prominent symptoms of inattention; however, it does not appear that he meets the full criteria for this disorder this date.

The diagnosis of dysthymic disorder, early onset is being made based on my interview with the claimant this date.  He claims that he was treated for this disorder at Seneca Health Services for several years.

PROGNOSIS: Fair.

CAPABILITY: In my opinion, Mr. Abad is currently capable of managing his own finances.

(Tr. at 395-400.)

On September 19, 2009, a State agency medical source completed a Psychiatric Review Technique ("PRTF") form. (Tr. at 403-17.) The evaluator, John Todd, Ph.D., concluded that Claimant did not have a severe organic mental disorder impairment regarding his "ADHD NOS" or a severe affective disorder impairment regarding his "Dysthymic D/O [Disorder] early onset". (Tr. at 403, 404, 406.) He found that Claimant had mild limitations regarding "restriction of activities of daily living" and "difficulties in maintaining concentration, persistence, or pace", no limitations regarding "difficulties in maintaining social functioning" and no "episodes of decompensation, each of extended duration." (Tr. at 413.) He concluded that the evidence does not establish the presence of the "C" criteria. (Tr. at 414.) Dr. Todd's analysis stated:

> CLMT [Claimant] is credible w/ [with] past psych [psychiatric] TX/meds [treatment/medications] and none presently. Clmt received a valid ave IQ score w/ MS WNL [within normal limits]/mild def [deficiencies] only. Clmt related performing personal care, does NOT need reminder for meds, simple meals, mother does cleaning, walks, shops, needs assist w/ finances though counts money, watch TV, reads magazines, has several friends and visits daily, plays X-box. There is no evidence of severe limitations due to mental D/O [disorders] and is considered NON-SEVERE.

(Tr. at 415.)

On October 24, 2009, Debra Lilly, Ph.D., provided a Case Analysis of Claimant' file and concluded: "I have reviewed all the evidence in file, and the PRTF of 9/19/09 is affirmed, as written." (Tr. at 418, 431.)

On December 17, 2009, Ms. Meadows, Seneca Health Services, stated that Claimant

presented for medication monitoring:

> Notes that he is doing well. Denies feeling depressed. Says he is here today for a general followup. Says he is sleeping okay. Says he is still not working. Says today that at times when he gets really angry, he will hit things but says that does not happen very often. Client notes that he does not believe that he needs to be on any kind of medications for his mood. Appetite is okay. Denies any auditory or visual hallucinations or suicidal or homicidal ideations...

> PLAN:
> Client does not want to be on any medications. He is willing to see a therapist. Was scheduled to see Lisa Morris for therapy. May return for a followup on an as needed basis.

(Tr. at 459.)

On January 25, 2010, Michael Morrello, M.S., Licensed Psychologist, provided a

Psychological Evaluation of Claimant upon a referral by his representative. (Tr. at 434-40.)

Mr. Morrello made these observations:

> Behavioral Observation/Mental Status:
> Jorai is a twenty-two-year-old male. He was adequately dressed and groomed for this evaluation. Eye contact was poor. Psychomotor activity was average. He was friendly, polite, and cooperative. Rapport was easy to establish and maintain.

> Short term memory was slightly deficient as Mr. Abad was able to recall two out of four words after several minutes. He was able to complete a serial three-subtraction task without error. He was successful at spelling the word "WORLD" and was successful at repeating this spelling backwards, "DLROW." He was oriented in all spheres. He was able to interpret parables through abstract reasoning.

> Jorai's affect was appropriate and reactive. He described his mood as "fairly well." His speech was congruent with affect, conversational in nature and of average volume and tone. His attention and concentration were judged to be adequate for the evaluation. He was able to understand and follow instructions. It is this psychologist's opinion that this evaluation is a valid and reliable sample of Jorai's current functioning, personality traits, and behavior patterns.

Test Results:

Wechsler Adult Intelligence Scale - Revision III:

Verbal IQ: 91...Performance IQ: 91...Full Scale IQ   91...

Overall, on the WAIS-III, Mr. Abad's cognitive functioning was measured within the Average range...On verbal skills, he scored within the average range.  On performance tasks, he scored within the average range...

Wide Range Achievement Test - Revision Four:...

On the WRAT, Mr. Abad's achievement scores were comparable to his ability scores.  On the Word Reading subtest, he scored (59) with the Average range and at the 12.2 grade level.  On the Sentence Comprehension subtest, he scored (46) within the Average range and at the 12.4 grade level.  On the Spelling subtest, he scored (40) within the Average range and at the 10.1 grade level.  On the Math Computation subtest, he scored (38) within the Average range and at the 8th grade level.  On Reading Comprehension, he scored (201) within the Average range.

Attention-Deficit/Hyperactivity Disorder Test (ADHDT):...

Mr. Abad's ADHD Quotient scored within the Below Average range for persons with ADHD.  On the Hyperactivity subtest, he scored within the Average range.  On the Impulsivity subtest, he scored within the Below Average range.  On the Inattention subtest, he scored within the Average range.

Bender Visual Motor Gestalt Test:

On the BVMGT, Mr. Abad produced drawings with few errors.  This is not suggestive of brain damage or organicity.

Beck Depressive Inventory-Revision Two:

On the BDI-II, Mr. Abad reported depressive symptoms that were measured within the mild range (15).  The symptoms that bother him most include: past failure and concentration difficulty.

Beck Anxiety Inventory:

On the BAI, Mr. Abad reported anxiety symptoms that were measured within the mild range (12).  The symptom that bothers him most is feeling hot.

Diagnostic Impression:

| | | |
|---|---|---|
| Axis I: | 314.9 | ADHD, NOS |
| | 311 | Depressive Disorder, NOS |
| Axis II: | V71.09 | |
| Axis III: | None | |
| Axis IV: | Vocational problem: Unemployed | |
| Axis V: | 60 (current) | |

Summary/Recommendations

Mr. Abad is a 22-year-old male who was referred to assess his overall psychological functioning. He is also applying for disability benefits. Mr. Abad reports difficulties with attention and concentration. His cognitive functioning was measured within the Average range. His achievement scores were commensurate with his ability level. Assessments indicate he is experiencing a mild amount of anxiety and depression...

Mr. Abad might benefit from learning new organizational and time management skills. He may benefit from learning to set goals and attempting to reach those goals. He may also benefit from stress management skills...Clinicians should use a cognitive behavioral approach to treat his depressive symptoms. He should be educated about cognitive distortions and how to recognize and refute them.

(Tr. at 436-40.)

On January 26, 2010, Mr. Morrello completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form. (Tr. at 441-44.) He marked that Claimant had a "Good" ability to maintain his personal appearance and to understand, remember, and carry out simple job instructions. (Tr. at 442.) He marked that Claimant had a "Fair" ability to understand, remember, and carry out detailed but not complex job instructions, follow work rules, relate to co-workers, use judgment, and interact with supervisors. (Tr. at 443.) He marked that Claimant had a "Poor" ability to deal with the public, deal with work stressors, function independently, maintain attention concentration, and understand, remember and carry out complex job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. at 442-43.) He marked that Claimant was able to manage benefits in his best interest. (Tr. at 444.) He opined: "Stress may increase depressive symptoms." Id.

On April 14, 2010, William D. Hagerty, M.A., Licensed Psychologist, Seneca Health Services, provided a Psychological Evaluation of Claimant upon referral to determine

25

diagnosis and treatment needs.  Mr. Hagerty stated:

> He has a history of depression however he reports that he currently is not feeling depressed.  He is not taking any medications at this time.

> **Mental Status and Behavioral Observations**
> Jorai arrived on time for his evaluation and was cooperative throughout the examination.  His appearance was casual and unkempt.  His responding to the examiner's questions was spontaneous and would appear unrehearsed. He was appropriately oriented to person, place, time and circumstances.  No symptoms of psychosis were observed, however, he presented as a person [who] has slowed cognition.  For example, when he was asked a question and/or when he was participating in conversation it'll take him longer than would be typical to respond to questions and/or respond during conversation.  He reported that he has no difficulty with his sleep or appetite. The MMSE indicated no significant cognitive impairment.
>                         *        *        *
> **Diagnostic Impression**:
> Axis I:        311              Depressive Disorder, NOS
> Axis II:       V71.09          No Diagnosis
> Axis III:      V71.09          No Diagnosis
> Axis IV:       Moderate: problems with taking responsibility
> Axis V:        GAF:55

> **<u>Summary and Recommendations</u>**:
> Jorai presented as a person who wants to have others take care of his financial concerns and manage his money, while he goes about living his life without any responsibility.  Moreover, he does not see any problem with him expecting others to care for him, while he shows a lack of appreciation for their efforts.

> I think this client should be made more responsible for his daily living activities, which could include financial obligations as well as managing a household.  Such responsibilities may be useful and teaching him what effort it takes to live independently.  Individual therapy could be used to direct this client's thoughts through reality focused activities.

(Tr. at 481-82.)

> On July 13, 2010, Ms. Meadows, Seneca Health Services, stated:

> Jorai presents for a followup.  Says he is not having any problems.  Says that he does not really know why he is here.  Says his aunt may have made the appointment.  Says he did not know he had no appointment until he got here today.  Denies feeling depression or anxiety.  Denies any mood swings.  Says

he is sleeping okay.  Denies any anger control issues.  He is unemployed.  He has applied for SSI.  Denies any alcohol or illicit drug use.  Denies any auditory or visual hallucinations or suicidal or homicidal ideations...

PLAN: Claimant does not want to be on any medications.  Denies any psychiatric symptomatology.  May return for a followup on an as needed basis.

(Tr. at 461.)

On September 22, 2010, Ahmed Faheem, M.D. completed a "form required...under West Virginia Code § 44A-2-3 in a case seeking the court appointment of a guardian and/or conservator for an alleged 'protected person'." (Tr. at 455-58.) Dr. Faheem stated:

He has had chronic problems with attention deficit issues.  He has experienced great difficulty in writing checks, balancing his money, paying his bills, and has reportedly been irresponsible with money according to his guardian aunt as well as the patient himself...

He has been with his aunt all his life and they have mostly taken responsibility for him after the patient lost his biological parents in a motor vehicle accident when he was only 18 months old...

It is my opinion that the appointment of a Guardian and a Conservator is necessary for this person...

The patient is helped with his finances in taking responsibility of his every day issues and needs help in making decisions...

He is not on any medications from me.

(Tr. at 456-57.)

On March 8, 2011, Harley E. Stollings, Mental Hygiene Commissioner, Circuit Court of Nicholas County, West Virginia, granted Joyann Rulli's petition for guardianship and conservatorship of Claimant based on the evaluation report of Dr. Faheem finding Claimant to have "chronic attention deficit issues... ongoing personality difficulties and has ongoing passive-dependent issues." (Tr. at 465.) Mr. Stollings concluded:

No less restrictive alternatives appear of record. The protected person would never have been competent to execute advance directives...has previously been exploited due to his passive dependent tendencies...

The protected person resides in a mobile home on the property where the proposed guardian and conservator resides...

No person has appeared in opposition to the petitioner's petition. The protected person's brother appeared in an earlier hearing without objecting to the relief sought...

The only limitation on the conservator should be to encourage the protected person to seek counseling and rehabilitation services for the purpose of maximizing the protected person's self-reliance and independence...

The protected person may receive social security disability or SSI benefits in the future. In such event, the conservator should be ordered to have herself appointed as payee for such benefits with[in] 90 days of the award or return to this court and post bond.

(Tr. at 465-68.)

On June 19, 2011, Dr. Urick, Seneca Health Services, provided a Psychiatric Diagnostic Evaluation. She stated:

Mr. Abad is a 23-year-old white male student with a history of Depressive Disorder NOS, who is a voluntary patient at Seneca Health Services, Inc. He is referred by his family physician for this admission to Seneca...

Mr. Abad reports that he is here because he needs to find out if he has ADHD. He brings with him a note written by a family member which says, "Dr. Sue Wantz said that he needs something for ADD or ADHD, that's what causes low concentration and temper management problem due to low self-esteem."...He is engaged but apparently does not want his family to know about this yet because she is of a different religious faith. He is not employed and does not seem to be seeking employment; it seems that he is depending on getting SSI. He is not covered by medical insurance.

MSE:
The patient is AOX4, exhibits good dress/grooming/ hygiene, has good eye contact and no psychomotor abnormality. Manner is appropriate. He presents his symptoms and concerns in a somewhat impressionistic fashion, and his report seems to be colored by things other people have said about him. It is somewhat difficult to get specific details as he is somewhat

28

circumstantial, and also tends to persevere on the same topics in a manner which provides little meaningful information.  Affect generally euthymic, mood "all right."  Speech WNL in rate, tone and content.  Thoughts are generally goal-directed, and there is no evidence of delusional content. Attention, concentration and impulse control are intact, and sensorium is clear. Cognition appears intact.  The patient denies lethal ideation.  Insight is partial, judgment is good.

DIAGNOSIS:
Axis I:          296.80          Bipolar Disorder NOS, provisional
                                 R/O [rule out] Dysthymic Disorder
Axis II:         V71.09          No Diagnosis.
                                 R/O Personality Disorder NOS with cluster C
                                 and/or B traits
Axis III:                        Deferred.
Axis IV:                         Financial problems; unemployment
Axis V:                          55

PROGNOSIS:                       Guarded.

RECOMMENDATIONS:
1. In order to address mood lability we will try Invega 3 mg qam.  The patient has verbalized understanding of common side effects, dosage and expected actions of medications, including delayed onset of efficacy, and of alternative treatments including not using medications; patient had been advised to contact the office in the event of any medication-related questions or concerns.  2.  The patient is encouraged to participate in individual therapy. 3.  Psychological evaluation is requested to better assess for Axis I and II diagnosis.
4.       Crisis intervention as appropriate.
5.       RTC 2 weeks.

(Tr. at 478-80.)

On July 5, 2011, Dr. Urick, Seneca Health Services, stated:

The patient presents for medication management.  The patient reports that Invega caused "terrible after-results."  He says that the first day he took it he hardly slept at all, the second and third days he was oversedated, so he stopped taking it.  He does say that it helped him feel calmer and says he could focus and concentrate, and his thoughts were definitely clearer.  He states that symptoms have returned since discontinuing the Invega...

PLAN: In order to address mood lability we will start Trileptal 150 qd and he may increase up to 600 qd at his discretion.  At some point we may consider

29

retrying Invega...Continuing counseling.  RTC two weeks.

(Tr. at 480.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ did not correctly consider whether Claimant met or equaled Listing 112.11 for the period of time when the claimant was between the ages of thirteen (13) through eighteen (18) years of age; and (2) the ALJ did not correctly consider whether Claimant met or equaled Listing 12.08 upon attaining 18 years of age.  (Pl.'s Br. at 7-10.) Specifically, Claimant argues:

> The ALJ's hypothetical question shows that the claimant may meet or equal Listing 112.11 and Listing 12.08.  Listing 112.11 applied during the period the claimant was between the ages of 13 and 18 years of age...
>
> Listing 12. 08 applied during the period the claimant reached 18 years of age through present...
>
> In the case at bar, the medical and school records show the claimant has met both listings, Listing 112.11 until age 18 and Listing 12. 08 thereafter.  The plaintiff has lived in a highly supportive environment with his aunts.  His aunts lived with or within fifty feet of the claimant and have supervised the claimant throughout the day.  His aunts have been responsible for most of his decisions and activities of daily living.  The claimant has been reminded to perform personal care, purchase items such as groceries, pay bills, attend doctor appointments, and maintain his home.  Furthermore, the claimant's aunts have provided and performed all these when the claimant has been unable to do so.  The plaintiff required a guardian/conservator on his behalf to ensure proper decisions are made.  The claimant has been taken advantage of and has exhibited damaging behaviors.  The claimant has episodes of severe depression and thoughts of suicide.  The school records show the claimant drew pictures of himself dead.  The claimant exhibits episodes of anger and punches holes in walls or throws things.
>
> The ALJ did not evaluate the claimant under listing 112.11.  Prior to attainment of 18 years of age the claimant should have been evaluated under that listing for ADHD.  In the case at bar, the claimant is alleging disability from 2001.  The claimant was 13 years old at that time.  This is the proper

30

listing to consider for that time period.

The ALJ evaluated the claimant under Listing 12.02. Listing 12.02 requires a specific organic factor such as a brain injury or stroke. There is no evidence of a specific organic factor such as a traumatic brain injury, stroke, or disease process after age 18. The plaintiff is entitled to be evaluated under 12.08. The plaintiff is entitled to be evaluated under every listing he may meet.

It is the plaintiff's position that the plaintiff met listing 12.11 prior to attainment of age 18 and meets listing 12.08 currently. As set forth above, listing 112.11 and 12.08 are met in the instant claim. Medical evidence, especially uncontradicted evidence, must be viewed by the Secretary in the light most favorable to the plaintiff. Smallwood v. Chater, 65 F.3d 87 (8th Cir. 1995). The ALJ erred in substituting his own opinion concerning the severity of the claimant's ADHD...The records of Dr. Faheem and Nicholas County Circuit Court show he meets listing 12.08 at the time of the hearing. The ALJ did not make findings about whether the findings of Dr. Faheem and the Nicholas County Circuit Court were credible. The records from Dr. Zavareei and Nicholas County Schools show the claimant met Listing 112.11 prior to age 18. The ALJ failed to make findings about the credibility of these records.

The claimant is entitled to remand to have a direct determination made whether he met Listing 112.11 and Listing 12.08.

(Pl.'s Br. at 7-10.)

<u>The Commissioner's Response</u>

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant was not disabled under the Social Security Act because Claimant does not meet Listings 112.11 and 12.08 because Claimant does not have marked mental limitations. (Def.'s Br. at 7-10.) Specifically, the Commissioner argues:

Plaintiff argues that he meets Listings 112.11 and 12.08 (Pl.'s Br. at 7-10). This argument has no merit because he does not have marked mental limitations. Therefore, the Commission respectfully requests that the Court reject Plaintiff's argument.

The Listings are a regulatory device used to streamline the decision process by identifying those claimants whose impairments are so severe that they are presumed to be disabled. 20 C.F.R. §§ 404.1525(a), 416.925(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The Listings define impairments that are

severe enough to prevent a person, regardless of age, education or work experience, from performing "any gainful activity." <u>Zebley</u>, 493 U.S. at 532. The claimant has the burden of proving a presumptively disabling impairment found in the Listings. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146, n.5 (1987). To meet this burden, the claimant must prove that she meets all of the requirements of a Listing. <u>Zebley</u>, 493 U.S. at 530. A claimant meets only some of the requirements of the Listing, "no matter how severely, does not qualify." <u>Id.</u>

With <u>Zebley</u> and <u>Yuckert</u> in mind, Plaintiff could not meet Listings 112.11 or 12.08 because both listings require marked limitations and the treatment records from Seneca do not mention anything more than moderate limitations. Dr. Urick and Ms. Meadows assigned Plaintiff GAF scores between 55 and 65, which connote only mild to moderate mental limitations (Tr. 370-71, 385, 393, 479). In his most recent report, Mr. Hagerty gave Plaintiff a GAF score of 55 (Tr. 390, 479).

The ALJ's decision reflects the findings of these treating Seneca sources. Specifically, the ALJ aptly determined that Plaintiff had only moderate restrictions in daily living, social functioning, and concentration, persistence, and pace and that Plaintiff did not have any periods of decompensation, which have been for extended duration (Tr. 19-20).

Although Mr. Morello and Dr. Faheem assigned great limitations to Plaintiff, their conclusions are inconsistent with those of Dr. Urick, who treated Plaintiff for more than seven years. Dr. Urick, the treating physician who knows Plaintiff the best of all the examining sources, observed that Plaintiff's attention, concentration, and impulse control were intact (Tr. 370-71, 373-74, 376, 378-81, 383-85, 479-80). Furthermore, his clinical team believes that Plaintiff is capable of more activities...

Since Plaintiff's treating team at Seneca did not appreciate marked limitations, Plaintiff is not presumptively disabled under Listings 112.11 or 12.08. Therefore, the Commissioner respectfully requests that the Court reject Plaintiff's listings' argument.

(Def.'s Br. at 7-9.)

<u>Analysis</u>

Claimant argues that the ALJ did not correctly consider whether Claimant met or equaled Listing 112.11 for the period of time when the claimant was between the ages of thirteen (13) through eighteen (18) years of age and did not correctly consider whether

Claimant met or equaled Listing 12.08 upon attaining 18 years of age.  (Pl.'s Br. at 7-10.)

The court will address the child listings and then the adult listing.

<u>Child Listings</u>

Listing 112.11 states:

**112.11 Attention Deficit Hyperactivity Disorder**.  Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.

The required level of severity of these disorders is met when the requirements in both A and B are satisfied.

A.      Medically documented finding of all three of the following:

        1.      Marked inattention; and
        2.      Marked impulsiveness; and
        3.      Marked hyperactivity;

and

B.      For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

Listing 112.02  states:

**112.02 Organic Mental Disorders**: Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain.  The history of physical examination or laboratory tests, including psychological or neurophyschological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes or loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

2. A. Medically documented persistence of at least one of the following:

1.      Developmental arrest, delay or regression; or

33

2.      Disorientation to time and place; or

3.      Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

4.      Perceptual or thinking disturbance (e.g., hallucinations, delusions, illusions, or paranoid thinking); or

5.      Disturbance in personality (e.g., apathy, hostility); or

6.      Disturbance in mood (e.g., mania, depression); or

7.      Emotional lability (e.g., sudden crying); or

8.      Impairment of impulse control (e.g., disinhibited social behavior, explosive temper outbursts); or

9.      Impairment of cognitive function, as measured by clinically timely standardized psychological testing; or

10.     Disturbance of concentration, attention, or judgment;

AND

B. Select the appropriate age group to evaluate the severity of the impairment:

1. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the following:

*      *      *

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a.      Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b.      Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests;

34

or

c.   Marked impairment in age-appropriate personal functioning,
documented by history and medical findings (including consideration
of information from parents or other individuals who have knowledge
of the child, when such information is needed and available) and
including, if necessary, appropriate standardized tests; or

d.   Marked difficulties in maintaining concentration, persistence, or pace.

The Social Security regulations provide that to determine functional equivalence
for children, an impairment must result in "marked" limitations in two domains of
functioning or an "extreme" limitation in one domain. § 416.926a(a).  "Marked" and
"extreme" are defined:

(2) *Marked limitation.* (I) We will find that you have a "marked"
limitation in a domain when your impairment(s) interferes seriously with
your ability to independently initiate, sustain, or complete activities.  Your
day-to-day functioning may be seriously limited when your impairment(s)
limits only one activity or when the interactive and cumulative effects of your
impairment(s) limit several activities.   "Marked" limitation also means a
limitation that is "more than moderate" but "less than extreme."

(3) *Extreme limitation.* (I) We will find that you have an "extreme"
limitation in a domain when your impairment(s) interferes very seriously
with your ability to independently initiate, sustain, or complete activities.
Your day-to-day functioning may be very seriously limited when your
impairment(s) limits only one activity or when the interactive and cumulative
effects of your impairment(s) limit several activities.  "Extreme" limitation
also means a limitation that is "more than marked."  "Extreme" limitation is
the rating we give to the worst limitations.  However, "extreme limitation"
does not necessarily mean a total lack or loss of ability to function.

§§ 416.926a(e)(2) and (3).

The ALJ made these findings:

1.  Born on October 10, 1987, the claimant had not attained age 22 as of
January 1, 2001, the alleged onset date (20 CFR. 404.102, 416.120(c)(4) and
404.350(a)(5)).
2.  The claimant has not engaged in substantial gainful activity since January
1, 2001, the alleged onset date (20 C.F.R. §§ 404.1571 et seq., and 416.971 et

35

seq.).
3.   The claimant has the following severe impairments: attention deficit
hyperactivity disorder (ADHD) not otherwise specified (NOS) and dysthymic
disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(Tr. at 18.)

The ALJ then determined: "4.   The claimant does not have an impairment or

combination of impairments that meets or medically equals one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,

416.920(d), 416.925 and 416.926)."  (Tr. at 19.)  In support of this conclusion, he wrote the

following:

> The claimant's mental impairments, considered singly and in combination,
> do not meet or medically equal the criteria of listings 12.02 and 12.04.  In
> making this finding, the undersigned has considered whether the "paragraph
> B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental
> impairments must result in at least two of the following:  marked restriction
> of activities of daily living; marked difficulties in social functioning; marked
> difficulties in maintaining concentration, persistence, or pace; or repeated
> episodes of decompensation, each of extended duration.  A marked limitation
> means more than moderate but less than extreme.  Repeated episodes of
> decompensation, each of extended duration, means three episodes within 1
> year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> In activities of daily living, the claimant has moderate restriction...
>
> In social functioning, the claimant has moderate difficulties...
>
> With regard to concentration, persistence or pace, the claimant has moderate
> difficulties...
>
> As for episodes of decompensation, the claimant has experienced no episodes
> of decompensation, which have been of extended duration.
>
> Because the claimant's mental impairments do not cause at least two
> "marked" limitations or one "marked" limitation and "repeated" episodes of
> decompensation, each of extended duration, the "paragraph B" criteria are
> not satisfied.

(Tr. at 19-20.)

Claimant argues that he meets Listings 112.11 (Pl.'s Br. at 7-10).  The Listings require

Claimant to have marked mental limitations.   As pointed out by the Commissioner, the

Listings are a regulatory device used to streamline the decision process by identifying those

claimants whose impairments are so severe that they are presumed to be disabled.  20

C.F.R. §§  404.1525(a), 416.925(a):

> The Listings define impairments that are severe enough to prevent a person,
> regardless of age, education or work experience, from performing "any
> gainful activity."  Sullivan v. Zebley, 493 U.S. at 521, 532 (1990).  The
> claimant has the burden of proving a presumptively disabling impairment
> found in the Listings.  Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987).  To
> meet this burden, the claimant must prove that she meets all of the
> requirements of a Listing.  Zebley, 493 U.S. at 530.  A claimant meets only
> some of the requirements of the Listing, "no matter how severely, does not
> qualify."  Id.

(Def.'s Br. at 7-8.)

Records from Seneca Health Services dated from September 28, 2004 to July 13,

2010, show Claimant was treated for depressive disorder and parent-child relationship

problems, not attention deficit disorder or an organic mental disorder.  (Tr. at 366-93, 459-

61.)    Dr. Urick, the treating physician, observed that Plaintiff's attention, concentration,

and impulse control were "intact" during his treatment as a child and remained so into the

adult years of his treatment. (Tr. 370-71, 373-74, 376, 378-81, 383-85, 479-80).  On August

14, 2009, when Claimant was 21 years old, Donna Meadows,  Seneca Health Services,

provided an evaluation of Claimant per a request from his representative regarding

Claimant's application for Social Security benefits and for the first time ADHD was

referenced due to Claimant's specific inquiry about the disorder.  (Tr. at 392-93.)    On

August 31, 2009, when Claimant was 21 years old, psychologist Larry J. Legg made a

diagnosis of ADHD "solely on my interview with the claimant today.  Mr. Abad reports a

history of prominent symptoms of inattention; however, it does not appear that he meets the full criteria for this disorder this date."  (Tr. at 399.)

The undersigned finds that Claimant did not meet Listings 112.11 because it requires marked inattention, marked impulsiveness, and marked hyperactivity, as well as at least two of the appropriate age-group criteria, and the treatment records from Seneca Health Services do not find "marked" limitations.  The ALJ's decision reflects the findings of the treating Seneca Health Services sources which show that Claimant did not have marked inattention, marked impulsiveness, marked hyperactivity, and at least two of the appropriate age-group criteria in paragraph B2 of 112.02.  The court notes that the opinions found in the school records do not conflict with the records of Seneca Health Services sources, i.e. they do not show that Claimant was diagnosed or treated for ADHD or an Organic Mental Disorder as a child.   (Tr. at 203-08, 284-313.)  [Please note footnote 3.]

<u>Adult Listing</u>

Listing 12.08 states:

> **12.08 Personality disorders**.   A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long term functioning and are not limited to discreet episodes of illness.
>
> The required level of severity of these disorders is met when the requirements in both A and B are satisfied.
>
> A.      Deeply ingrained, maladaptive patterns of behavior associated:
>
> > 1.      Seclusive or autistic thinking; or
> > 2.      Pathologically inappropriate suspiciousness or hostility; or
> > 3.      Oddities of thought, perception, speech and behavior; or
> > 4.      Persistent disturbances of mood or affect; or
> > 5.      Pathological dependence, passivity, or aggressivity; or
> > 6.      Intense and unstable interpersonal relationships and impulsive

AND            and damaging behavior;

B.      Resulting in at least two of the following:
1.      Marked restriction of activities of daily living; or
2.      Marked difficulties in maintaining social functioning; or
3.      Marked difficulties in maintaining concentration, persistence, or pace; or
4.      Episodes of decompensation, each of an extended duration.

The undersigned finds that Claimant did not meet Listings 12.08 because it requires marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and episodes of decompensation, each of extended duration.  The treatment records from Seneca Health Services,  from the period that Claimant had reached adult status, do not indicate "marked" limitations.     (Tr. at 383-93, 459-61, 478-82.)  The ALJ's decision reflects the findings of the treating Seneca Health Services sources.  Specifically, the ALJ concluded that Claimant had only moderate restrictions in daily living, social functioning, and concentration, persistence, and pace and did not have any periods of decompensation, which have been for extended duration. (Tr. at 19-20.)

The undersigned finds that the opinions of Dr. Faheem are inconsistent with those of Dr. Urick and Mr. Hagerty, both of Seneca Health Services, who treated Claimant for approximately six years.  The undersigned also notes that Mr. Morrello found Claimant's cognitive functioning was "within the Average range" and that his achievement scores were "commensurate with his ability level."  (Tr. at 439.)  He further concluded "Assessments indicate that he is experiencing a ***mild*** amount of anxiety and depression [emphasis added]."  Id.  It is further noted that the State agency medical source, Mr. Legg, concluded that Claimant's pace and social functioning were only mildly deficient, and that his

39

concentration and persistence were within normal limits.  (Tr. at 398-99.)

As noted previously, Dr. Urick, the treating physician, observed that Plaintiff's attention, concentration, and impulse control were "intact" during his treatment as a child and remained so into the adult years of his treatment. (Tr. 370-71, 373-74, 376, 378-81, 383-85, 479-80).  Furthermore, Mr. Hagerty, Seneca Health Services, concluded that Claimant "should be made more responsible for his daily living activities, which could include financial obligations as well as managing a household.  Such responsibilities may be useful and [sic, in] teaching him what effort it takes to live independently." (Tr. at 482.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. § 416.927(d) (2010).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. § 416.927(d)(2).

Under § 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Section 416.927(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the

more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

Regarding Listings 12.08, the undersigned concludes that the medical records do not show that Claimant was diagnosed with a personality disorder showing: "Deeply ingrained, maladaptive patterns of behavior associated: Seclusive or autistic thinking; or Pathologically inappropriate suspiciousness or hostility; or Oddities of thought, perception, speech and behavior; or Persistent disturbances of mood or affect; or Pathological dependence, passivity, or aggressivity; or Intense and unstable interpersonal relationships and impulsive and damaging behavior; **and** resulting in at least two of the following: Marked restriction of activities of daily living; or Marked difficulties in maintaining social functioning; Marked difficulties in maintaining concentration, persistence, or pace; or Episodes of decompensation, each of an extended duration."

The undersigned notes that on June 19, 2011, Dr. Urick for the first time in her six years of treatment with Claimant reported that she was going to do additional testing to "R/O [rule out] Personality Disorder."  (Tr. at 479.)  Therefore, clearly there was no diagnosis of a personality disorder, particularly one with the behaviors outlined above. Additionally, records from Seneca Health Services dated from September 28, 2004 to July 13, 2010, show Claimant was treated for depressive disorder and parent-child relationship problems, not a personality disorder.  (Tr. at 366-93, 459-61.)

Conclusion

Based upon the opinions of Claimant's treating physician and treating psychologist, Claimant does not have marked limitations and is not presumptively disabled under

Listings 112.11 or 12.08.   The undersigned finds that it is immaterial that the ALJ "did not make findings about whether the findings of Dr. Faheem and the Nicholas County Circuit Court were credible...(which) show the claimant met Listing 112.11 prior to age eighteen." (Pl. Br. at 10.)   Contrary to Claimant's assertion, the forms completed by Dr. Faheem and the Nicholas County Circuit Court do not show that Claimant met Listing 112.11 prior to age eighteen.  (Tr. at 455-58, 462-71.)  Dr. Faheem's form report shows his conclusions were based on a one-time examination, when Claimant was nearly 23-years-old, on September 22, 2010.  (Tr. at 455-58.)  The report does not show that Dr. Faheem made a record review of Claimant's medical or educational history.   Id.  As pointed out by the ALJ, Mental Hygiene Commissioner Harley E. Strollings relied "in large part on the findings of Dr. Faheem...that a guardianship/conservatorship was warranted." (Tr. at 27." Therefore, his report cannot be considered credible and reliable evidence showing Claimant to have met Listing 112.11.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: September 5, 2012

Mary E. Stanley
United States Magistrate Judge

42